UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MINI MELTS USA, INC., *et al.*,
    *Plaintiffs*,

v.

MINI MELTS, INC., *et al.*,
    *Defendants*.

No. 3:15-cv-01704 (JAM)

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

It is a venerable principle of contract law that an "agreement to agree" does not itself constitute an enforceable agreement. That is true notwithstanding the parties' best of intentions that they will reach an agreement one day. Just as the freedom of contract allows parties to agree to be bound by an agreement, it equally allows for the parties to agree that they will *not* be bound unless they enter a future agreement.

If the parties have expressly agreed that there will be no enforceable agreement unless they agree to one, it is not for the courts to imply that there exists an enforceable contract. It is not for the courts to balance all the equities and to decide that it would be unfair not to lock the parties into an agreement that they declined to reach in the first instance. As Justice Cardozo has observed, "we are not at liberty to revise while professing to construe." *Sun Printing & Publ'g Ass'n v. Remington Paper & Power Co.*, 235 N.Y. 338, 346 (1923).

Plaintiffs here have sued defendants to enforce terms of a provision that anticipates defendants' sale of assets but is expressly conditioned upon the parties agreeing to "a mutually acceptable purchase agreement." It is a classic agreement to agree. And it is unenforceable as a matter of law. Accordingly, I will grant summary judgment for defendants.

## BACKGROUND

"Mini Melts" is a cryogenically frozen ice cream product that is sold in many markets worldwide. Somewhat similar to the equally alliterative "Dippin' Dots" brand, Mini Melts are produced using nitrogen to flash freeze ice cream in the form of tiny colorful pellets.

The plaintiffs in this case are Mini Melts USA and two of its principals, Shawn and Daniel Kilcoyne. The defendants are Mini Melts, Inc. (MMI), which owns the U.S. trademark for Mini Melts, and Thomas Mosey, the owner of patents used to produce the Mini Melts product.

In 2004, the Kilcoynes entered into a customer agreement with MMI in order to become one of MMI's distributors. The Kilcoynes eventually became MMI's biggest customer. As the relationship between the parties progressed, they discussed the possibility of the Kilcoynes taking over and eventually purchasing MMI.

On June 6, 2008, Mosey sent a Letter of Intent to the Kilcoynes. *See* Doc. #73-1 at 56–57. In the letter, Mosey proposed to sell MMI to the Kilcoynes, offering several "purchase options." The Kilcoynes did not purchase MMI in response to this letter, but the parties continued to discuss the possibility.

In December 2009, after a series of discussions, the parties signed a non-binding Deal Terms document. The Deal Terms contemplated "two phases: (A) Turnover of operations to [plaintiffs], and (B) purchase of intellectual property." Doc. #77-1 at 16. The document focused mostly on the first phase, the turnover of operations. This phase contemplated plaintiffs becoming the exclusive manufacturer of Mini Melts in the United States, discussed what assets would be transferred to plaintiffs, and discussed royalty payments to be paid to defendants by plaintiffs in return for their greater role in the manufacture of Mini Melts.

As to the purchase of intellectual property, the Deal Terms stated that "at any time after closing, [plaintiffs] may purchase all US intellectual property . . . for the price of $3,000,000 less any credits against the purchase price from Purchaser's royalty payments or sales of territories." *Id*. at 17. The Deal Terms, however, also included the following language at the end: "These deal terms are not binding on either party unless or until they are included in a definitive, binding Purchase and Sale Agreement. Seller reserves the right to decline any offer in its sole discretion." *Ibid*.

In April 2010, the parties entered into a Manufacturing and Distribution Agreement (MDA). Under the MDA, plaintiffs became the exclusive manufacturer and distributor of Mini Melts within the United States. *Id*. at 21. The MDA specified that plaintiffs' term as manufacturer and distributor would last for five years and then automatically renew for an additional five years as long as plaintiffs were not in default and paid a specified royalty. *Id*. at 22. The MDA also gave plaintiffs the right to use two patents held by defendants and provided for the transfer and lease of certain equipment. *Id*. at 23.

The MDA featured a standard "integration" clause, stating that the MDA "represents the complete and final understanding of the parties with respect to the subject matter hereof. It supersedes any previous understandings, oral or written, between the parties and any such prior understandings or agreements shall no longer have any force or effect." *Id.* at 46.

In addition, the MDA also contained the following "termination-by-purchase" clause that is now the focus of this lawsuit:

> **Termination by Purchase.** Distributor [plaintiffs] may terminate this Agreement at any time by paying the sum of Three Million Dollars ($3,000,000.00), less credits for Owner's [defendants'] share of Exclusive Territory Fees, for the leased machinery, equipment, goodwill, Patents and trademarks licensed under this agreement, and other assets pursuant to a mutually acceptable purchase agreement

3

> that meets the criteria of the "Deal Terms" document executed by the parties on or about December, 2009.

*Id*. at 41–43.

On October 16, 2015, about four and a half years after entering the MDA, the Kilcoynes sent a letter to defendants, stating that they were terminating the MDA pursuant to the termination-by-purchase clause. Doc. #16-2 at 2. Attached to this letter were a commitment letter (showing that plaintiffs had secured an investor to make the $3 million purchase) and a draft purchase agreement. *See id.* at 3–13, 23. Defendants rejected plaintiffs' attempt to terminate the MDA by purchase, arguing that the MDA's termination-by-purchase clause was non-binding.

Plaintiffs then filed this action in November 2015, alleging breach of contract (Count One) and breach of the implied covenant of good faith and fair dealing (Count Two). The parties have filed cross-motions for summary judgment on both counts of the complaint, offering very different interpretations of the meaning and nature of their agreements.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). My role at the summary judgment stage is to decide if there are enough facts in dispute to warrant a trial. Of course, I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then to decide if those facts would be enough—if eventually proved at trial—to allow a jury to decide the case in favor of the opposing party. If the facts do not rise to the level that would allow a reasonable jury to rule in the opposing party's favor, then there is no point in allowing the lawsuit to proceed, and the motion for summary judgment will be granted. *See generally Tolan v. Cotton*, 134 S. Ct.

4

1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### *Count One - Breach of Contract*

Plaintiffs allege that defendants breached a contract between the parties when they refused to allow plaintiffs to terminate the MDA by purchase for $3,000,000. The parties agree that Connecticut law governs this diversity action. "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014). At issue now is the first element: whether the parties formed a valid and binding sales contract.

Under Connecticut law, "where there is definitive contract language, … the determination of what the parties intended by their contractual commitments is a question of law." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 101 (2014). By contrast, "when the language of a contract is ambiguous, the determination of the parties' intent is a question of fact." *Ibid.* Of course, I am not required to find that a contract is ambiguous simply because the parties advance starkly different interpretations of the language in question. *See, e.g.*, *Gabriel v. Gabriel*, 324 Conn. 324, 341 (2016*).*

Plaintiffs argue that the termination-by-purchase clause constitutes a binding option contract. An option contract is "an offer by one to sell within a limited time and a right acquired by the other to accept or reject such offer within such time." *Cutter Dev. Corp. v. Peluso*, 212 Conn. 107, 109 (1989). The offer in an option contract is a "continuing offer" and is "irrevocable until the expiration of the time period fixed by agreement of the parties." *Pack 2000, Inc. v. Cushman*, 311 Conn. 662, 675 (2014). In plaintiffs' view, the termination-by-purchase clause of

the MDA is an irrevocable offer for plaintiffs to purchase defendants' intellectual property for $3,000,000. Plaintiffs contend that they accepted that offer in October 2015, thus forming a binding bilateral sales contract between the parties.

For their part, defendants argue that the termination-by-purchase clause of the MDA did not give rise to a binding sales contract, whether labeled an "option contract" or otherwise. Focusing upon the portion of the termination-by-purchase clause stating that plaintiffs could terminate the agreement and purchase defendants' assets only "pursuant to a mutually acceptable purchase agreement," they contend that the termination-by-purchase clause established no more than an unenforceable "agreement to agree" in the future. I agree with defendants.

Under Connecticut law, "an agreement to agree does not give rise to a contractual relationship." *Realty Res. Chartered v. The HB Nitkin Grp.*, 2009 WL 2243695, at *7 (D. Conn. 2009). Further, "the general rule is that an agreement to agree is too indefinite to be legally binding when it requires a superseding contract the terms of which must be negotiated." *Kulick v. City of Hartford*, 2007 WL 4707809, at *2 (Conn. Super. 2007).

In *SS-II, LLC v. Bridge St. Assocs.*, 293 Conn. 287 (2009), the Connecticut Supreme Court considered the enforceability of a putative option to purchase property under the terms of a lease agreement between two parties. The court declined to enforce the agreement because "the option to purchase in the present case also expressly anticipates a *future* agreement between the parties with respect to the environmental land use restriction," such that "the option to purchase did not guarantee that the plaintiff would be able to purchase the property but simply constituted an agreement to agree." *Id.* at 300-01; *see also Makari v. D & A Realty, LLC*, 2005 WL 895869, at *1 (Conn. Super. 2005) (parties' entry into a purchase agreement not enforceable where under

6

the terms of the agreement "it is contemplated that there would be a full contract" in the nature of a real estate contract of sale).

Here, the termination-by-purchase clause explicitly contemplates another agreement when it notes that a sale of defendants' assets would only occur "pursuant to a mutually acceptable purchase agreement." In my view, this language plainly and obviously shows that a sale may not take place unless and until the parties reach a subsequent agreement, the terms of which must be acceptable to all parties.

This interpretation is consistent with rulings of other courts that have interpreted similar contractual language. For example, in *Dumas v. First Federal Sav. and Loan Ass'n*, 654 F.2d 359 (5th Cir. Unit B 1981) (*per curiam*), the Fifth Circuit interpreted an agreement that stated "on its face that it [was] subject to a later, 'mutually acceptable' agreement." *Id.* at 361. The court held that "clearly, [the term] 'mutually acceptable' connotes that the terms of the agreement are still subject to negotiation and not final" and that "any other reading would obfuscate the plain meaning of the language." *Id.* at 360. Accordingly, the court concluded, "the provision can only mean the parties did not intend the [] agreement to be a binding, enforceable contract." *Id.* at 361. *See also Bank One, Texas, N.A. v. Apex Energy, LLC.*, 2001 WL 1335881, at *2 (N.D. Tex. 2001) (holding that "'mutually acceptable' language . . . confirms that future negotiations were envisioned"); *Kopple v. Schick Farms, Ltd.*, 447 F. Supp. 2d 965, 971 (N.D. Iowa 2006) (holding that a "letter of intent list[ing] a purchase price of $1,900,000" was not binding because it also provided that "[a] form of Contract mutually acceptable to Buyer and Seller . . . shall be used").

I am not persuaded by plaintiffs' counterarguments. First, they argue that the phrase "pursuant to a mutually acceptable purchase agreement" contemplated no more than a

7

formality—that it "did not *condition* the sale on a formal contract, it merely identified the means by which the contemplated sale and termination would be formalized." Doc. #81 at 13 (emphasis in original). To support this point, plaintiffs contend that the words "pursuant to" have a different meaning than "subject to," which is used elsewhere in the MDA to connote contingency. *Id*. at 13–14. They argue that if the parties had wanted to make the termination-by-purchase clause conditional on another mutually acceptable agreement, they would have used the phrase "subject to" rather than "pursuant to."

I don't agree that the use of "pursuant to" changes the termination clause's meaning. According to plaintiffs, "pursuant to" means "'in the course of carrying out: in conformance to or agreement with: according to.'" *Id*. at 13 (quoting *Nation-Bailey v. Bailey*, 316 Conn. 182, 197 (Conn. 2015)). But that definition is not inconsistent with my interpretation. Indeed, it is precisely defendants' argument that any purchase must be "in conformance to or agreement with" the terms of a future agreement that is "mutually acceptable" to the parties.

Plaintiffs next argue that defendants' interpretation of the termination clause is at odds with the MDA's broader purpose. They suggest that the "parties' shared desire for a sale is . . . evident throughout the MDA and its ancillary agreements." Doc. #81 at 6. Specifically, plaintiffs note that the MDA's Recitals state that "distributor would like to purchase the business from Owner," and that "Owner is interested in selling the business to Distributor if adequate financing can be obtained, subject to certain conditions and timing." Doc. #77-1 at 20. In addition, plaintiffs point to terms in the contract that would kick in if there were a purchase, and argue that "[t]he parties would not have negotiated for, or included, these material provisions regarding a sale had they not already agreed that a termination by purchase was the mutually-desired purpose of the MDA." Doc. #76 at 16.

8

But these portions of the MDA show at best that the parties seriously contemplated a sale, something neither party disputes. The question here, however, is whether the termination-by-purchase provision constitutes a legally enforceable agreement. Because the language highlighted by plaintiffs is aspirational and conditional, it offers little support for plaintiffs' argument. To the contrary, language indicating that the parties "would like" to enter into a sale suggests the opposite—that no agreement had yet been made, but that the parties were hoping to execute one in the future, "subject to certain conditions and timing," the details of which are unclear.

Third, plaintiffs rely on the basic principle of contract interpretation that "every provision must be given effect if reasonably possible." *Issler v. Issler*, 250 Conn. 226, 240 (1999). They note that defendants' interpretation would render inoperative other provisions of the termination-by-purchase clause, including its specific purchase price of $3 million. But it is sadly not possible here to give effect to every provision of the MDA. If I give effect as plaintiffs wish to the $3 million price term, then I will not be giving effect to the "mutually acceptable purchase agreement" term.

Lastly, plaintiffs argue that even if the termination-by-purchase clause contained a condition precedent requiring a mutually acceptable future agreement, that condition should be excused under the so-called "prevention doctrine." This doctrine provides that "if a party to a contract prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, [that party] is not relieved of the obligation to perform, and may not legally terminate the contract for nonperformance." *Blumberg Assocs. Worldwide, Inc. v. Brown & Brown of Connecticut*, 311 Conn. 123, 176 (2014). But the Connecticut Supreme Court has made clear that "the prevention doctrine fail[s]

9

as a matter of law [when] the allegedly hindering conduct by the defendants occurred before the contract existed." *Id.* at 178. In other words, the prevention doctrine only applies if the parties have already entered into a binding contract (albeit one containing a condition precedent). For the reasons I have already explained, the termination-by-purchase clause did not constitute a binding sales contract in the first instance. Accordingly, the prevention doctrine does not apply here.

In light of my conclusion that the termination-by-purchase clause did not constitute a binding sales contract, it is not necessary for me to resolve several of the other issues raised in the parties' briefing and at oral argument. For example, plaintiffs and defendants have discussed in considerable detail whether the MDA contained all of the "essential terms" for a sale. But even a perfectly well-defined transaction is not enforceable if it was never agreed to. Plaintiffs rely on *Bayer v. Showmotion, Inc.*, 292 Conn. 381 (2009), in which the Connecticut Supreme Court held that parties "may form a binding contract even if some nonessential terms of their agreement are indefinite or left to further negotiations." *Id.* at 411. The agreement at issue in *Bayer*, however, contained no language that was analogous to the phrase "pursuant to a mutually acceptable purchase agreement" found in the termination-by-purchase provision of the MDA. The facts of this case—involving an agreement to agree in the future to the terms of a mutually acceptable purchase contract—are distinguishable from *Bayer* and other cases where an agreement simply leaves out nonessential terms or where parties later opt to negotiate such terms.[1]

---

[1] Defendants also argue that by requiring that the future purchase agreement "meet[] the criteria of the 'Deal Terms' document," the termination-by-purchase clause effectively incorporated into the MDA the provision of the Deal Terms stating that its "terms are not binding on either party unless or until they are included in a definitive, binding Purchase and Sale Agreement," and that "Seller reserves the right to decline any offer in its sole discretion." In light of my resolution of this action in defendants' favor on alternative grounds, I need not consider that additional argument.

*Count Two - Breach of Covenant of Good Faith and Fair Dealing*

Count Two of the complaint alleges that defendants are liable for breach of the covenant of good faith and fair dealing. Given my conclusion above, I must also grant summary judgment for defendants on this claim.

"It is axiomatic that the implied duty of good faith and fair dealing is a covenant implied into a contract or contractual relationship." *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 359 (D. Conn. 2014). Under Connecticut law, a plaintiff asserting a breach of the covenant of good faith and fair dealing must prove three elements: (1) that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; (2) that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and (3) that when committing the acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith. *Id.* at 359-60; *see also Capstone Bldg. Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 794-95 (2013).

In light of my conclusion above that the termination-by-purchase clause of the MDA did not bind the parties, plaintiffs could not have "reasonably expected" defendants to treat it as binding and to acquiesce to plaintiffs' demand. Plaintiffs therefore cannot satisfy the first element of this cause of action as a matter of law. Accordingly, I will grant summary judgment for defendants on plaintiffs' claim of breach of the covenant of good faith and fair dealing.

## CONCLUSION

For the foregoing reasons, the Court concludes that the termination-by-purchase clause of the parties' Manufacturing and Distributing Agreement does not create an enforceable agreement

for defendants to sell their assets to plaintiffs. Accordingly, defendants' motion for summary judgment (Doc. #77) is GRANTED. Plaintiffs' motion for summary judgment (Doc. #72) is DENIED.

The Clerk of Court shall enter judgment for defendants and close the case.

It is so ordered.

Dated at New Haven this 18th day of September 2017.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge